IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| DONNA LAMBERT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 5:13-cv-00096 |
| | ) | |
| v. | ) | |
| | ) | |
| SHEETZ INCORPORATED, | ) | By: Hon. Michael F. Urbanski |
| | ) | United States District Judge |
| Defendant. | ) | |
| | ) | |

# MEMORANDUM OPINION

In this case, Donna Lambert ("Lambert") claims her former employer, Sheetz Incorporated ("Sheetz"), terminated her employment in retaliation for her complaints regarding the discharge of another Sheetz employee whose termination was allegedly in violation of the Americans with Disabilities Act ("ADA"). Sheetz filed a motion for summary judgment, Dkt. No. 27, and, for the reasons that follow, Sheetz's motion will be granted.

## I.

Lambert was a store manager for the Sheetz store in Woodstock, Virginia, until September 2012. During her time working for Sheetz, Lambert received "favorable performance evaluations, commendations, awards, and bonuses." Compl., Dkt. No. 1, at *2. Karen Stevens ("Stevens") was Lambert's supervisor and a district manager for Sheetz. One of the methods Sheetz uses to evaluate its store managers' performance is a quarterly survey of each store's employees. Part of the internal survey requires staff to answer open-ended questions regarding their store and store manager.

Lambert received a low score on her Fall 2011 internal survey that ranked her 327 out of 347 stores nationwide and second to last in her district. Stevens Decl., Dkt. No. 27-3, at *2. Some of the answers to the open-ended questions reflected negatively on Lambert but not all of the responses

were negative. See Stevens Decl., Ex. 1, Dkt. No. 27-3, at *35-34. After receiving the Fall 2011 internal survey results, Stevens decided to conduct personal interviews with employees at Lambert's store.

Stevens interviewed Lambert's staff and reported her findings to her human resources coordinator, Lainie Snider ("Snider"). Stevens Decl., Dkt. No. 27-3, at *2. Snider instructed Stevens to give Lambert a discipline notice and place her on a performance action plan. Id. at *2-3; Stevens Decl., Ex. 2, Dkt. No. 27-3, at *37-40. In Lambert's 2011 end-of-year performance evaluation, Stevens asked Lambert to improve employee morale at the store. Id. at *3. Throughout 2012, Lambert received various complaints from both employees and customers regarding her conduct at the store. See Id. at *4; Stevens Decl., Exs. 5, 6, Dkt. No. 27-3, at *48-54.

On July 19, 2012, Stevens arrived at Lambert's store to suspend her for unsatisfactory job performance. Earlier that morning, Stevens fired another Sheetz employee, Kelly Morris ("Morris").[1] During that meeting, Lambert told Stevens she had spoken to Morris before Stevens arrived and thought Morris's termination was "wrongful." Lambert Dep., Dkt. No. 27-2, at 21:1-22:7. After returning from her suspension, Lambert and other store managers from Stevens's district had individual meetings with Snider. Id. at 28:17-20. Lambert began her meeting with Snider by stating that she felt Morris had been "wrongfully terminated." Id. at 31:4-13. Snider responded that the meeting was not about Morris's termination. Id. at 30:21-31:3, 31:18-32:4. The following month, September 2012, Sheetz discharged Lambert for "Unsatisfactory Job Performance – Creating a negative work environment as evidence [sic] by investigation in response to employee complaints." Dkt. No. 34-1 at *1.

---

[1] Morris is the plaintiff in a related lawsuit, Morris v. Sheetz Inc., No. 5:13cv00095 (W.D. Va.). In that case, Morris claims her termination was in retaliation for taking FMLA leave and discrimination under the ADA. Here, Lambert alleges retaliation only under the ADA. See Compl., Dkt. No. 1.

2

## II.

According to Sheetz, Lambert cannot establish a prima facie ADA retaliatory discharge claim because there is no evidence Lambert engaged in any opposition or participation conduct, and, even if she did, Sheetz had a legitimate, non-retaliatory reason for discharging her. Lambert argues her complaints about Morris's termination, taken in context, constitute opposition activity under the ADA, and she participated in an internal investigation regarding Morris's termination. Furthermore, Lambert argues that reasonable jurors could differ as to whether Sheetz's proffered reason for terminating her employment was pretextual.

### A.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

3

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)).  Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S Ct. 1861, 1863 (2014) (per curiam)).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255.  However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252).  Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249).  "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### B.

To establish a prima facie case of retaliation a plaintiff must prove three elements: "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). "Protected activity . . . is divided into two categories, opposition and participation." Laughlin v. Metro Washington Airports Auth., 149 F.3d 253, 257 (4th

4

Cir.1998); 42 U.S.C. § 12203(a).[2] Participation consists of "(1) making a charge [with the EEOC]; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under [the statute]." Id. "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id. (citing Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir.1981)).

## C.

First, Lambert cannot establish a prima facie retaliation claim under a "participation" theory. The comments she made about Morris's termination being wrongful were in no way connected to an investigation by the EEOC or any other body authorized to conduct investigations, proceedings, or hearings under the ADA. See Laughlin, 149 F.3d at 259; see also McNair v. Computer Data Sys., Inc., 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999) (unpublished per curiam decision) ("Once appellant filed her first charge with the EEOC, the protections of the 'participation clause' were unquestionably triggered. Because appellant alleges that CDSI retaliated against her for actions taken *before* she filed her first EEOC charge, however, we need only consider this claim under the terms of the section's 'opposition clause.'"); Hatmaker v. Mem'l Med. Ctr., 619 F.3d 741, 747 (7th Cir. 2010) (joining other circuits in ruling that "the 'investigation' to which section 2000e-3 refers does not include an investigation by the employer, as distinct from one by an official body authorized to enforce Title VII.") Lambert's participation in the meeting with Snider was part of an internal company investigation, and, regardless, the meeting had nothing to do with Morris's termination. Lambert only assumed that meeting was about Morris's termination; a theory Snider immediately debunked. See Lambert Dep., Dkt. No. 27-2, at 29:4-32:4, 38:13-39:8. As such, Lambert

---

[2] Title VII and the ADA use "parallel language" and "courts have routinely used Title VII precedent in ADA cases." Fox v. General Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001); Baird v. Rose, 192 F.3d 46, 470-71 (4th Cir. 1999); compare 42 U.S.C. § 2000e-3 with 42 U.S.C. § 12203.

5

can only proceed on her retaliation claim if she can prove a prima facie case under an "opposition" theory.

### D.

Protection from retaliation does not extend to "opposition . . . to all unlawful employment practices [or] to practices the employee simply thinks are somehow unfair." McNair, 1999 WL 30959 at *5. Indeed, in order to establish a prima facie case of retaliation, the plaintiff must have made more than "'general complaints of unfair treatment.'" Id. (quoting Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)); see also Mixon v. Charlotte-Mecklenburg Schs., No. 3:11-cv-228, 2011 WL 5075808, at *6 (W.D.N.C. Aug. 5, 2011) ("A mere complaint of harassment or discrimination in general, without any connection to a protected class, is insufficient.") (citing Bonds v. Leavitt, 629 F.3d 369, 384 (4th Cir. 2011)). An employee's complaint must put the employer on some sort of notice that the employee is opposing activity protected by the statute because "an employer cannot take action because of a factor of which it is unaware . . . ." Dowe v. Total Action Against Poverty in the Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).

### 1.

In McNair, the Fourth Circuit concluded that a plaintiff failed to make a prima facie case of retaliation when her complaints "at best support[ed] a vague inference . . . that she had been treated unfairly." McNair, 1999 WL 30959 at *5. The plaintiff's complaint contained not "even implicit or indirect opposition to racial or sexual discrimination." Id. In Barber v. CSX, the plaintiff sent a letter to his company's human resources department detailing his over twenty years of experience with the company and complaining that the company awarded a position to a "'less qualified individual'" than him. Barber, 68 F.3d at 697. According to the court, that letter was "just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the

6

ADEA." Id. at 702. Specifically, the letter did not "explicitly or implicitly allege that age was the reason for the alleged unfairness." Id.

In Mixon, the plaintiff's retaliation claim failed because her complaints did not suggest that "she put CMS on notice that race discrimination or harassment was ever an issue. . . . [T]he alleged comments about Plaintiff's hair and weight neither explicitly nor implicitly referred to race or any other protected category." Mixon, 2011 WL 5075808 at *6 (emphasis omitted). In Felix v. Sun Microsystems, a plaintiff did not engage "in protected opposition activity when she complained about harassment." Felix v. Sun Microsystems, Inc., No. Civ. JFM-03-1304, 2004 WL 911303, at *19 (D. Md. Apr. 12, 2004). The plaintiff's complaints in Felix "never mentioned the ADA or the FMLA, nor did she state that she believed [her husband's] termination to be unlawful. The day of [her husband's] termination, [she] called Human Resources to say his discharge was 'wrong.'" Id. She complained of "retaliation . . . related to her husband, but there [was] no evidence that she clarified what she meant by [that] statement." Id. Those complaints "were so generalized" that they failed as a matter of law. Id. Finally, in Monk v. Potter, another plaintiff's generalized complaints failed to make a prima facie case of retaliation. The plaintiff in Monk used the terms "harassment" and "retaliation" in an EEOC complaint, but he did not allege the harassment and retaliation "was based on his sex." Monk v. Potter, 723 F. Supp. 2d 860, 880 (E.D. Va. 2010), aff'd sub nom., Monk v. Donahoe, No. 10-1943, 407 F. App'x 675 (4th Cir. 2011) (unpublished per curiam decision).

## 2.

Here, Lambert fails to make a prima facie claim of ADA retaliation because she fails to show that she engaged in protected opposition activity. The only times Lambert complained about Morris's termination, she merely made the generalized comment that Morris's termination was "wrongful." The first time she complained about Morris's termination being wrongful, Lambert admits she "really did not know what [Morris] was terminated for at the time." Lambert Dep., Dkt.

7

No. 27-2, at 117:7-14. She never once told anyone at Sheetz that she felt Morris's termination was wrongful under the ADA or referenced Morris's mental health conditions. She unequivocally repeated in her deposition time and time again that she told her superiors Morris was "wrongfully terminated" but never gave a reason as to why she felt so. Id. at 21:1-22, 22:5-7, 30:22-32:1, 38:20-39:8, 54:6-55:15, 59:1-60:10, 63:3-18, 117:3-14, 118:1-9, 141:17-142:4, 143:22-144:7, 177:5-14. There is no evidence that Lambert ever even described Morris's termination as "unlawful." Accord Felix, 2009 WL 911303, at *19.

Lambert claims there is a factual question because she understood the interview she had with Snider was part of an inquiry as to Morris's termination. Lambert admitted she didn't know the real reason for the interview. Lambert Dep., Dkt. No. 27-2, at 29:22-30:14; 175:3-9. Before Snider even spoke, Lambert started the meeting by telling Snider she "felt that [Morris] was wrongfully terminated." Id. at 30:8-32:7; 38:13-39:13. Snider quickly dismissed the notion that the interview had anything to do with Morris's termination, and there was no mention of Morris again. Id. Lambert also relies on a statement allegedly made by Snider that Lambert "was sent to the corporate office because [Lambert] had told [Snider] that [Lambert] felt [she] was being retaliated against because [she] spoke up for Kelly Morris." Id. at 54:6-12. However, there is no evidence in the record that Lambert made any statements about being retaliated against because Morris's termination was unlawful or wrongful under the ADA. A generalized comment about retaliation will not satisfy the first prong of a prima facie retaliation claim. See Felix, 2004 WL911303 at *19; Monk, 723 F. Supp. 2d at 880. In short, Sheetz had no "notice" of why Lambert thought Morris's termination was wrongful because her comments did not even implicitly or indirectly refer to discrimination under the ADA. Dowe, 145 F.3d at 657; Mixon, 2011 WL 5075808 at *6.

8

**3.**

At oral argument, Lambert argued that the context in which a general comment is made can constitute opposition activity for a retaliation claim and cited Anderson v. G.D.C., Inc., 281 F.3d 452 (4th Cir. 2002). However, Anderson is distinguishable. Anderson involved a sexual harassment claim, and the plaintiff was "barraged with comments of a sexual nature." Id. at 456. At one point, the plaintiff's supervisor touched her in a sexual manner, and the plaintiff rejected her supervisor's advances. Thereafter, the plaintiff's supervisor told her there was no work for her, and the plaintiff eventually quit her job and found employment elsewhere. The Fourth Circuit held, on those facts, there was "sufficient evidence to reach a jury on [the] retaliation claim." Id. at 458.

Lambert attempts to compare the facts in Anderson to those here in order to argue that the context of the July 19, 2012 interaction between Lambert and Stevens and the later conversation between Lambert and Snider establishes a jury question. Essentially, Lambert argues that because Stevens had just fired Morris and Morris immediately called Lambert, there was enough context for Stevens to infer that Lambert thought Morris's termination was wrongful under the ADA. Lambert also claims that the context in which she told Snider she was being retaliated against for speaking up for Morris means Snider should have known Lambert's comment was protected. While the court agrees that context in certain circumstances could be a factor in determining whether an employer knew the employee was opposing unlawful discrimination, Lambert's attempt to compare this case with Anderson is unavailing.

First, the plaintiff's comment rejecting her supervisor's advances in Anderson was not general by any means and specifically referred to the improper touching that occurred immediately beforehand. See Anderson, 281 F.3d at 456. Second, a general comment like "no," "stop," or "wrong" in the context of sexual harassment is completely different than simply saying a co-worker's termination was "wrongful" without giving any other reason or elaboration. There are a

9

multitude of reasons of why someone might think a co-worker's termination was wrongful, but "not all unlawful employment practices nor . . . practices the employee simply thinks are unfair" are protected under the ADA. McNair, 1999 WL 30959 at *5. Finally, Lambert's own testimony does not support her argument.

Lambert testified Morris called her soon after being terminated and before Stevens arrived at Lambert's store. Lambert Dep., Dkt. No. 27-2, at 19:1-20:20. According to Lambert, Morris was "hysterical. She – I could not get much out of her. She was crying so hard. And she had told me that she had been terminated, and that Karen had told her to write a statement, and she said she wrote four pages." Id. at 19:3-7; Id. at 115:22-116:21. Then Stevens arrived and said to Lambert "'I assume you've talked to Kelly.'" Id. at 21:3-4; Id. at 117:5-6. Lambert said "'Yes, I have, and I' – my opinion was I thought she was wrongfully terminated." Id. at 21:5-6. Lambert did not recall anything else about her conversation with Stevens regarding Morris's termination. Id. at 21:17-22:7. Stevens did not explain why Morris had been terminated during that conversation. Id. at 23:10-13. Critically, Lambert testified "I really did not know what [Morris] was terminated for at the time. I mean, [Morris] and I didn't have no discussion over the phone." Id. at 117:12-14. If Lambert had no idea why Morris was terminated, she certainly couldn't have thought it was wrongful under the ADA or even insinuated as much during her conversation with Stevens.

Furthermore, there is no evidence to suggest that the context of Lambert's conversations with Snider about retaliation had anything to do with the ADA or Morris's bipolar disorder. According to Lambert she told Snider "I felt that I was being retaliated against because I spoke up for Kelly Morris." Id. at 54:10-12. Lambert couldn't remember exactly when she first told Snider she thought she was being retaliated against for speaking up for Morris. Id. at 54:6-56:14. There is a complete lack of evidence to give any context to that conversation other than Lambert using the phrase "retaliated against" for speaking up for Morris. Specifically, there is no mention of anything

10

that might implicate the ADA. Simply saying the phrase "retaliated against" to an employer in a general sense without explicitly or implicitly referencing the statute or the alleged discriminatory conduct cannot satisfy the first requirement of a prima facie retaliation claim. See Felix, 2004 WL911303 at *19; Monk, 723 F. Supp. 2d at 880. Lastly, Morris had not even filed an EEOC complaint at this point; she filed it after Lambert was terminated. See Morris v. Sheetz Inc., No. 5:13cv00095 (W.D. Va.), Compl., Dkt. No. 1, at *2.

Lambert's general statements about "wrongful termination" or "retaliation" do not give rise to an ADA retaliation claim under the circumstances here. Lambert never complained that Morris's termination was wrongful under the ADA or because Morris had mental health conditions. According to her own testimony, she never even described the termination as "unlawful." Without any inference as to why Lambert thought Morris's termination was wrongful, Sheetz had no notice of what protected activity Lambert was opposing. Indeed, the only time she mentioned the ADA was in her post-termination EEOC complaint and in this lawsuit with the benefit of counsel and 20/20 hindsight. Her complaints neither "explicitly nor implicitly" referred to the ADA, and no reasonable juror could conclude as much. Thus, Lambert has failed to establish the first element of prima facie ADA retaliation claim and Sheetz is entitled to summary judgment.

## III.

In conclusion, Lambert cannot establish a prima facie retaliation claim. The only "investigation" she participated in was a purely internal investigation by Sheetz, and the investigation had nothing to do with Morris's termination. Thus, Lambert's retaliation claim for "participation" fails. Furthermore, there is no evidence from which a reasonable juror could conclude that Lambert gave Sheetz any indication she thought Morris's termination was unlawful or wrongful because it somehow violated the ADA. As such, Sheetz's motion for summary judgment will be granted, and this case will be dismissed.

An appropriate order will be entered this day.

Entered:  March 31, 2015

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge